J. S. RAICH, C. P. Burnstad, D. L. Anderson, H. A. Shepard, Chas. Hernett, and Theodore Meyer v. OSCAR LINDEBEK.

(161 N. W. 1026.)

**Evidence — admissibility — rulings on — errors predicated on — jury — instructions.**

    1. Certain assignments of error predicated upon rulings on the admissibility of evidence and the court's instructions to the jury examined, and *held* to be without merit.

**Corporation — stock in — contract to take — conventional obligation — fraud — vitiates — whatever fraud creates — justice will destroy.**

    2. As a general rule a contract to take stock in a corporation stands upon the same footing as all other conventional obligations. If induced by fraud,

it creates no obligation, and the injured party has a right to have it abrogated. The rule is universal, whatever fraud creates justice will destroy.

Opinion filed March 5, 1917.

From a judgment of the District Court of Logan County, *Nuessle, J.,* plaintiffs appeal.

Affirmed.

*A. B. Atkins,* and *Hugo P. Remington,* for appellants.

*Geo. M. McKenna* and *Miller, Zuger, & Tillotson,* for respondent.

CHRISTIANSON, J.   About June 6, 1911, one Hood, a special agent for the Hastings Industrial Company, and the plaintiff Shepard, called on the defendant, who, at their solicitations subscribed his name to a certain writing upon which the present action is founded.   The instrument in question recites that the subscribers, being desirous that a Gathered Cream Power Butter Factory be located at or near Burnstad in Logan county, enter into this agreement with the Hastings Industrial Company for the construction and equipment of such butter factory according to certain plans and specifications for the sum of $4,000; that it is not a binding contract unless the sum of $4,000 or more shall be subscribed, and that no subscriber is liable for a greater interest in the factory when completed than is represented by the amount of the subscription.   The instrument further provides for the appointment by the subscribers of an executive committee of three to represent the subscribers in the inspection and acceptance of the work, and the formation of a corporation to own and operate the butter factory, the aggregate amount of capital to be not less than the contract price of the construction thereof; each subscriber to receive a certificate of stock to the amount of the par value of his paid-up subscription.   The evidence shows that the Hastings Industrial Company sent a representative to examine into the financial responsibility of each of the various subscribers, and that such representative notified the plaintiffs in this action that the Hastings Industrial Company would not construct the proposed butter factory, as it did not deem the subscribers financially responsible.   Certain negotiations were thereafter had between the plaintiffs and the representative of the Hastings Industrial Company, as a result of which the plaintiffs executed and

delivered their notes to the Hastings Industrial Company for the contract price, whereupon the Hastings Industrial Company constructed the butter factory and assigned to the plaintiffs the instrument signed by defendant herein, and the plaintiffs bring this action thereon as such assignees.

The defendant in his answer and in his testimony asserted that his signature to the contract was obtained by fraud and misrepresentation.

He testified that his signature was obtained under the following circumstances: Mr. Shepard drove out there along about 4 o'clock in the afternoon, somewhere along about June 6th, as near as I can remember. I was out hauling manure, and they drove up to where I was working, and Mr. Shepard says "Hello," and I says "Hello," and he says, "I am around with a man by the name of Hood for the purpose of building a creamery, seeing how many signers, how many cows, there is," and he introduced me to Mr. Hood. I told him no, I didn't want to have anything to do with it, and we talked a while, and finally it started raining and we drove to the barn. He was in a hurry to go, and he says, "Oh, well, it don't make any difference—we are just seeing—you had better put your name down," and Mr. Hood stepped out of the buggy and held it up against the barn and I signed it. He said there is nothing binding about it at all.

Q. Now state what Mr. Hood said this paper was.

A. He said it was just to see how many cows, to see how many signers they could get, to see how many they could get. He says they was going to have a meeting after they got forty or more signers, to see whether they could build a creamery at Burnstad or not.

Q. Go ahead, what else did he say. What did he say this paper was?
A. He said it was just a paper to be signed,—just around to see how many signers they could get for the creamery.

Q. Did he say anything about this being a contract?
A. No, sir, never mentioned a contract.

Q. *Did you see any contract?*
A. *No, sir.*

Q. Did you have this list in your hand at any time?
A. No, sir. Mr. Hood held it in his hand.

Q. What did they say about what they were going to do after they got this paper signed?

A. Said they was going to hold a meeting at Burnstad.

Q. For what purpose?

A. To see how many would take shares.

Q. In what?

A. In the creamery.

Q. Well, what did they say about taking shares in the creamery?

A. I don't understand.

Q. What did they say about a meeting down there,—what did he say would be the purpose of it?

A. For the purpose of seeing how many would take a share in the building of the creamery at Burnstad.

Q. What did he call this paper?

A. That paper, he called this a paper, that there was nothing to it, and said only just to see how many cows and how many would be in favor of building a creamery.

Q. Did you rely on the statement of Mr. Hood and Mr. Shepard?

A. I did on Mr. Shepard.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

Q. When did they tell you that you would be bound to take a share of stock?

A. They never said anything about being bound to take any share of stock.

Q. Now at the time you signed this list what was on it?

A. All the names above my name was on it,—that is all.

Q. Just the names on there that appear above yours?

A. Yes, sir.

Q. Charles Hernett, Harley A. Shepard, Pharos B. Hinds, and C. B. Starkey?

A. Yes, sir.

Q. Just those four names?

A. Yes, sir.

Q. Was this (indicating) scratched off the same way it is now?

A. Yes, sir, the same way.

Q. *Did you know at the time you signed this list that there was any other writing or printing on the inside or back of that sheet?*

A. *No, sir.*

Q. *They didn't show it to you?*

A. *No, sir.*

Q. And they didn't tell you it was there?

A. No, sir, they didn't.

Q. Show the jury how Mr. Hood held it when you signed it.

A. It was this way (indicating) against the barn, and it was raining, and I just wrote my name on there, and he put the figures on there afterwards.

Q. Who held the paper?

A. Mr. Hood. It was raining at the time and they were in a hurry to go.

The original contract is not in the record, and consequently we are in no position to know its appearance. It was, however, used upon the trial and exhibited to the court and the jury, and from the questions asked and answers given during the examination of the defendant, it would appear that the printed contract was on one side of the paper or on a different sheet of paper, and that the sheet where defendant affixed his signature was occupied wholly by signatures of the various subscribers.

The special agent, Hood, did not testify, but the plaintiff Shepard squarely contradicted the testimony of the defendant on all material points. The only question submitted to the jury was whether defendant's signature was obtained by means of false and fraudulent representations.

The jury returned a verdict for the defendant, and the plaintiffs appeal from the judgment.

The first assignment of error is predicated upon alleged error in the admission of testimony regarding the refusal by the Hastings Industrial Company to construct the creamery. This evidence was admissible under the allegations of the answer, the sufficiency of which was not challenged, but the court eventually decided that the evidence thus introduced did not constitute a matter of defense as against these plaintiffs, and expressly withdrew this question from the jury's consideration.

In its instructions the court said: "So far as your consideration of this case is concerned, gentlemen, the issues have been narrowed down

so that *the only matter left for your consideration is the matter as to what took place at the time the contract was in fact signed up by the defendant, Oscar Lindebek.* The contract is in evidence in this particular case. From the evidence in the case it appears that the defendant, Lindebek, admits that he signed such contract, but he contends, as I have stated,—he has set out in his answer that he was induced so to do by false and fraudulent representations and deceit on the part of the Hastings Industrial Company. *So far as your consideration of this matter goes, the plaintiffs in this case are the owners of the contract in question for all the purposes of this suit, and they are entitled to recover thereon if the Hastings Industrial Company would have been entitled to recover thereon if it had continued to own and hold the contract and had brought suit thereon. So the only question for your consideration is as to whether or not the signature of Oscar Lindebek to the contract, exhibit 1, was obtained by fraud and false representations* on the part of the Hastings Industrial Company, or its agent, and the plaintiff Shepard at the time the same was signed. I might say, gentlemen of the jury, that in this case the defendant having set up a charge of fraud on the part of the plaintiffs and their predecessors in interest, the burden is upon the defendant to establish the allegations as to fraud, set out in his answer, by a preponderance of the evidence. That is, it appearing that he did in fact sign the contract in question, to establish his defense, he must show by a preponderance of the evidence in this case that such contract was signed by him by reason of fraud and false representations, and unless he does do so, your verdict must be for the plaintiffs in this case."

We are by no means satisfied that the court committed any error in the admission of the evidence above referred to. It tended to establish certain affirmative allegations in the answer, the sufficiency of which had not been challenged. If subsequent developments upon the trial demonstrated that such evidence was of no probative force upon any material issue in the lawsuit, plaintiffs' counsel should have moved that it be stricken and the jury cautioned to disregard it. But, even if it be conceded that a duty rested upon the court to do so without specific request, the instructions above quoted clearly cured any error that might have existed, and eliminated from the jury's considera-

tion all questions upon which the evidence could have had any possible bearing adverse to the plaintiffs.

Upon cross-examination of the plaintiff Hernett certain correspondence between him and the Hastings Industrial Company was offered and received in evidence without objection. On redirect examination, plaintiffs' counsel was permitted to interrogate the witness fully with respect to what he meant by certain statements in his letters. After having full examined with respect to such matter, plaintiffs' counsel also propounded the following question to him:

"Q. What were the crop conditions in the year 1911?"

Error is assigned on the court's ruling in sustaining an objection to this question. Plaintiffs' counsel contends that the witness should have been permitted to answer, for the reason that one of the letters stated that a certain number of the signers on the contract had failed to make settlement. It should be remembered that the sole issue submitted to the jury was whether the defendant's signature to the contract on June 6, 1911, was obtained by means of fraudulent representations. It is difficult to see how the crop conditions in 1911 could have had any bearing on this question. It was not a matter directly connected with the direct examination of the witness. And we are wholly satisfied that the trial court committed no reversible error in sustaining the objection.

The record shows that the court gave the following instructions to the jury: "If the defendant in this case signed the contract in question without any representations made as to the character of the paper, but signed it willingly without making any investigation and relying upon his examination of the paper such as was made, then and in that case there would be no false representations, and there were no fraud and deceit such as would enable him to resist payment under the contract in question.

"I charge you, gentlemen of the jury, further, that if you find that the defendant had good reason to know and believe that the paper which he signed was a list or agreement to take a share of stock of the value of $100 and to pay the sum of $100 on the completion of the creamery in question according to the terms of that contract, that you should find for the plaintiffs and against the defendant, and that the fact that the defendant did not read the contract would make no dif-

ference in this particular case; that is, if the defendant entered into this matter blindly, and as a reasonable man, considering all that was said and done, he should have known what he was signing. If he was not induced to sign by reason of any false and fraudulent representations, then and in that event you must find for the plaintiffs.

"I charge you further that in order to find that the signature of the defendant was procured by fraud you must find the proof of fraud clear and convincing, and that the burden of proof as to the fraud is upon him who alleges it. That is, the defendant alleges that the signature was secured by fraud, and he must prove by a preponderance of the evidence that such was the case, and the plaintiff does not need to prove that there was no fraud unless the defendant has proved there was. "You are further instructed that a mere promise of profits to result, or that an investment is good, or any promise to act in the future, is not fraudulent, and cannot be taken into consideration as evidence of fraud. Neither can false statements as to the law or the legal effect of a paper be considered as fraud. If a man knows the contents or the substance of an instrument he signs, even though he may be deceived as to whether or not the contract is binding, he is none the less bound by the instrument which he has signed."

Error is also assigned upon the trial court's refusal to give the following instruction: "You are further instructed that if Mr. Lindebek, the defendant in this action, signed the contract with an oral or written agreement made at the same time, knowing that the contract was to be presented to other people for signature, he has no right, after other people have signed the same, knowing of his signature, to assert his verbal agreement, nor seek to avail himself thereof."

It should be remembered that this is not an action by a corporation to enforce a stock subscription in its favor, and where the rights of other subscribers to the capital stock of the corporation is involved. But it is an action brought by the plaintiffs as assignees of the Hastings Industrial Company, and they stand in the shoes of such company for all purposes. Self-evidently, there could be no estoppel operating in favor of the Hastings Industrial Company or its assignees. Nor was the defendant permitted to avoid liability under a verbal agreement. The court's instructions, which we have quoted above, excluded from the jury's consideration all questions except that of fraud.

It will be noted from the testimony of the defendant, hereinabove set out, that a meeting was to be held at Burnstad at some future date to "see how many would take a share in the creamery."

During his examination defendant was asked and answered the following questions:

Q. What did they say to you about your right to take your name off this list, or did they say anything?

A. He said I could take my name off the list any time I wanted to or else at that meeting.

Q. When did they tell you that you would be bound to take a share of stock?

A. They never said anything about being bound to take any share of stock.

Plaintiffs' counsel objected to these questions "as immaterial and incompetent as regards all the other plaintiffs except Shepard, and under the rule in the Minnesota case inadmissible for any purpose in this lawsuit."

Plaintiffs' counsel contends that the court erred in overruling these objections, for the reason that this testimony tended to show a. secret understanding between the defendant and the promoters, and constituted a fraud upon the other subscribers. It is well to note again that these plaintiffs are not asserting their right to recover as representatives, or assignees, of the corporation, but predicate their right to recover upon an assignment from the promoters, and they stand for all purposes in the shoes of the promoters.

It should also be noted that the objection interposed was a general one, and did not point out the particular ground of objection now asserted. There is nothing in the record to show what Minnesota case was referred to, and we cannot assume that it pointed out any reason rendering the questions objectionable, in view of the court's ruling. The presumption is that the court ruled correctly, and appellant has the burden of presenting a record affirmatively showing error.

It is the duty of counsel in stating an objection to evidence, to specify the particular grounds relied on, unless it is one which could not possibly have been obviated on the trial. Kolka v. Jones, 6 N. D. 461, 66 Am. St. Rep. 615, 71 N. W. 558; Flora v. Mathwig,

19 N. D. 4, 121 N. W. 63; Dallas v. Luster, 27 N. D. 450, 147 N. W. 95; Buchanan v. Minneapolis Threshing Mach. Co. 17 N. D. 343, 116 N. W. 335; 9 Enc. Ev. 58; Huston v. Johnson, 29 N. D. 546, 151 N. W. 774.

We have grave doubts whether plaintiffs' objection was sufficient to raise the ground now urged. But even the ground which plaintiffs now urge is wholly untenable in view of the courts' instructions and the issue presented to the jury for determination.

It is doubtless true as a general rule that all secret agreements made with particular subscribers at the time they subscribe are discharged by law, and in an action to enforce the contract of subscription evidence of such agreements is not admissible. This doctrine rests primarily upon the ground that such secret agreements in themselves constitute a fraud upon other subscribers and sometimes upon the public. 10 Cyc. 414. It has been held, however, that such secret agreements made by the promoters, whereby the subscriber was induced to subscribe, although invalid as against the corporation, may nevertheless be valid and enforceable against the promoters. 10 Cyc. 414. But this rule of law—which plaintiffs seek to invoke—has no application in this case.

The issue in this case was not whether the defendant was released from liability under the terms of a parol agreement made prior to, or contemporaneous with, the signing of the stock subscription; but whether he was induced to sign the same by means of false and fraudulent representations. And "contracts to take stock in a corporation stand upon the same footing as all other conventional obligations. If induced by fraud, they create no obligation, and the injured party has a right to have them abrogated. The rule is universal, whatever fraud creates, justice will destroy." Vreeland v. New Jersey Stone Co. 29 N. J. Eq. 188; Thomp. Corp. 2d ed. § 706.

There is a well-recognized distinction between parol agreements and fraudulent representations. Cook (Cook, Corp. 6th ed. §§ 136, 145) says: "A parol agreement includes all representations and stipulations made before or at the time of subscribing, but not included in the written subscription, whereby the corporation is to do something or refrain from doing something in the future. A fraudulent represen-

tation, on the other hand, is a statement as to past acts or existing facts, or the omission of such a statement, which amounts to a fraud on one who, relying thereon, subscribes to the stock of the company. Difficulty sometimes arises in determining whether a statement by a corporate agent inducing a subscription is merely a parol agreement or is a fraudulent representation. This question is one which must be decided first of all; since the rules of law applicable to parol agreements, as a defense to an action on a subscription, differ greatly from those applicable to fraudulent representations." Section 136.

"Any false statement by the authorized agents of a corporation in regard to the past or present status of the corporate enterprise or material matters connected therewith, whereby subscriptions are obtained, is a fraudulent representation." Section 145.

The defendant in this case claimed that his signature to the contract was obtained by false representations as to the nature of the paper. If the defendant signed the paper under the circumstances he recited, and in reliance upon the representations which he claims were made, it created no obligation on his part, and he had an absolute right to repudiate the alleged contract.

The court, in instructions too plain and positive to be misunderstood, limited the jury to a consideration of the sole question of fraudulent representations. There was a square conflict in the evidence upon this issue, and the verdict of the jury is binding upon this court. We find no error requiring or justifying a new trial. Every act on the part of the trial court was eminently fair to the plaintiffs, and they have no occasion to complain. If any error was committed by the trial court during the trial of the case, it was committed in favor of plaintiffs rather than against them.

The judgment appealed from must be affirmed. It is so ordered.