W. A. MARLATT, Appellant, v. EUGENE COUTURE, Respondent.

(169 N. W. 582.)

**Negotiable instruments — conditional delivery in violation of condition — maker not liable.**

1. Where a promissory note is executed conditionally, and delivery is made in violation of such conditions, no liability arises on such note.

**Promissory note — false and fraudulent representations — procured by — invalid.**

2. Where a promissory note is procured by false and fraudulent representations, the same has no validity and the maker incurs no liability thereon.

**Corporation stock — promissory note given for — conditional making — on note illegally given no liability arises.**

3. Where a promissory note is given for corporate stock, assuming that the conditions were such that a promissory note could be legally given, no liability arises upon the note in absence of the delivery of the stock.

Opinion filed May 25, 1918.   Rehearing denied November 30, 1918.

Appeal from the District Court of Rolette County, North Dakota, Honorable *C. W. Buttz,* Judge.

Affirmed.

*Fred E. Harris,* for appellant.

*Charles A. Verret* and *Flynn & Traynor,* for respondent.

GRACE, J.   Appeal from the district court of Rolette county, North Dakota, Honorable C. W. Buttz, Judge.

This is an action to recover upon a promissory note for $150. The complaint is in the ordinary form. The answer admits the execution of the promissory note, and, by way of defense, alleges a total failure of consideration, and further alleges that the note was executed conditionally upon certain alleged agreements set forth in the answer, and that the note was not to become effective until the conditions were fulfilled; that there was an express agreement between plaintiff and defendant at the time of the execution of the note, that the plaintiff should furnish the defendant certain shares of stock in the corporation known as the St. John Creamery Company, which is alleged to be insolvent at the time of the execution of the note and at all times since, and that such fact was known to the plaintiff; that the plaintiff had no right or authority to sell or agree to sell such stock and was unable to and never did deliver such stock to defendant. There were further allegations in the answer as to representations, and an express promise on behalf of the plaintiff that the buildings and machinery of the St. John Creamery Company, which was not then in operation, should be fixed up and put in good operating condition within a reasonable time after the execution of said note; that the plaintiff would cause said St. John Creamery Company to resume its operation in first-class shape within reasonable time. Then follows the allegation that such representations were false and fraudulent, and made for the sole purpose or

obtaining the signature of the defendant, and allegations that none of the conditions were performed by the plaintiff. The facts in the case are as follows:

In 1909, the plaintiff had constructed a creamery at St. John, North Dakota. This company was incorporated under the laws of North Dakota, and its stockholders were farmers and business men in the vicinity of St. John. Plaintiff had a mortgage upon the creamery and its contents. Plaintiff was in the business of selling creamery machinery. In 1913, the creamery, for a time, ceased to do business.

It is contended by plaintiff that, at the time of getting new subscriptions and notes and the promissory note in question, he was getting them as additional security for the protection of the debt due him. The defendant denied that he had any knowledge that the plaintiff was taking the new subscriptions for that purpose at the time he gave the note in question. The note was executed with the understanding and agreement that the defendant would get three shares in the St. John Creamery Company, which shares were never delivered to the defendant. The following indorsement was on the back of the note: "Collateral to St. John Creamery Company notes and mortgages for $4,300 dated October 22, 1909."

The defendant denies that such indorsement was on the note at the time of its execution. The following is the agreement set forth in the subscription list:

"For value received, we, the undersigned, hereby agree to pay the sum set opposite our respective names, in cash, to W. A. Marlatt, for which shares of stock will be issued by the St. John Creamery Company, said sum was, when paid in cash, to be applied on mortgage given to said, W. A. Marlatt by St. John Creamery Company, and the balance, if any, to be paid over to the St. John Creamery Company and may be used as surplus or working capital. If any notes given same will be held as collateral security to mortgage notes." The defendant signed this subscription list.

Defendant claims, at the time he signed the note, the plaintiff represented to him he would get Mr. Hagan from Devils Lake for manager in such creamery, who, it appears, was regarded as very competent for that position. The plaintiff denies this and claims that what he said to Mr. Clifford while at the bank when the note was signed was, that

41 N. D.—9.

he would get Mr. Hagan or someone equally as good. Plaintiff claims he made no representation about putting the plant in first-class shape. In fact, there is practically a conflict of testimony on all these alleged representations. Clifford, the cashier of Rolette County Bank, where the note was signed, testifies that at the time just before the note was signed, there was talk between Marlatt, Couture, and himself with reference to the deal, and that Marlatt said to him he would endeavor to get Mr. Hagan to run the creamery. Clifford testified that all notes and money went to Marlatt. McPherson, another witness, testified that on exhibit 3, the subscription list, he subscribed $100 and paid it. He testified that Mr. Marlatt represented to him he intended to get Mr. Hagan to run the creamery, and that this money was going to be appropriated to the keeping up of the creamery. The testimony of Cain is largely to the same effect, neither of these witnesses were theretofore connected with the creamery.

Whether Marlatt represented that he would get Hagan as manager or whether he would put the creamery in operation, and whether the note was signed by reason of such representations made by the plaintiff, were all disputed questions of fact which were properly submitted to the jury, as well as the question of fact of whether the stock was delivered.

Thomas Clifford, the cashier of the bank, and Marlatt, had a conversation which commenced in front of the bank; and, in reference to such conversation, Wright testified as follows:

"The way the conversation started, Mr. Clifford introduced me to Marlatt and we shook hands, and Tom says, 'We got a proposition for you, Elmer,' and I says, 'What is it?' and he says, 'Come on in,' and we merely stepped through the door. We had been talking on the street up to that time, and we stepped through the door of the bank, and nearly all this explanation took place just inside the door. He says, 'We are talking about starting the creamery up next spring,' and then I think it was Mr. Marlatt that spoke up, and he said, 'Mr. Wright, there isn't any reason why your creamery couldn't run and be a success the year around,' and I says I didn't see why it shouldn't run the year around myself. Then Mr. Marlatt says, 'The way you can keep that running is to go to it and sell more stock. Get around to all the men in this country and sell them stock and with the money you raise from that put

your creamery in working shape.' And then Hagan had been talked of for months and came up in this way: I says, 'If we had Hagan back, he could make it pay,' and he says, 'Hagan will come,' and he told me he had left Hagan that day, or the day before, or a day or two before that, he had come from the lake, and that he had his promise he would come, and I says, 'All right, if Hagan will take it I will subscribe for more stock,' and then he says, 'Tom Clifford is taking more stock and I will take $150 worth,' and I says, 'All right, if that is the case, put me down for $150,' and then it seems I signed up. I never got the stock certificate like they was supposed to issue. There was more to that conversation too. Then it was that Mr. Marlatt said he could keep the creamery running and buy butter and eggs and keep it running the year round, and I told them of an incident where I talked with a man who was sending his cream down below on account of getting a little more for it, and they suggested that we all work together and see these parties and interest them, and get them to get some stock even if it was only one share for $50, and then I says, 'Supposing this thing don't materialize, will our notes be still held?' and I don't remember which man says, 'No, they won't,' but Mr. Marlatt also told me he was going to take stock in it too, so I says, 'If it doesn't materialize, what will come of our notes?' and one or the other of them, I don't remember which one, said, 'If this deal don't materialize, they won't be used,' and I didn't know they had been used until later and there was some agitation about it. I haven't heard from mine and I didn't know it was used until later."

Upon cross-examination, the same witness testified as follows:

"They told me these notes wouldn't be used if they weren't used to start the creamery up and put it in operation. They didn't say forever and ever. They were going to get it running good and keep it going."

It was shown by the testimony of Lyman, another witness, that the board, meaning the creamery board, took up the proposition of obtaining money from Mr. Marlatt which he obtained by the subscriptions. He testified that Mr. Wheaton was president of the board, and the board authorized Wheaton to write Marlatt that:

"We decided to put the creamery in operation and ask him for money. He was in Winnipeg at the time, and Mr. Wheaton, the president, wrote him."

Witness's testimony also shows that Mr. Marlatt did not help in getting the plant in operation at any time since the 29th day of November, 1913. Marlatt denies all these representations both as to whether made by himself or Clifford, and denies that he ever authorized anybody to make any such representations for him.

There are three main defenses to the note:

1. That it was executed conditionally.

2. That the note was procured by reason of false and fraudulent representations of the plaintiff.

3. That there was no consideration for the note.

The question whether the false and fraudulent representations were made was a question of fact for the jury. There was testimony given at the trial tending to establish the false and fraudulent representations alleged to have been made.

Sufficient testimony has been set out to fully demonstrate this. The testimony was conflicting, but the jury were the exclusive judges of the weight and credibility of the testimony of the witnesses; and it having found in favor of the defendant, its finding is conclusive in this regard. The making of the false and fraudulent representations at the time of securing the execution of the note is established as a fact by the verdict of the jury. Defendant's signature to the note having thus been obtained by false and fraudulent representations above referred to, he incurred no liability by reason of having signed said note, and is under no obligation by reason of having signed it, and he had the undoubted right, under the circumstances, to repudiate the alleged contract; that is, the note.

The testimony also shows that the stock for which the $150 note was given was never delivered to defendant. At the time of the execution of the note, the creamery company was not a going concern, and was practically insolvent. Although the defendant had previously been a stockholder in the creamery company, there was no consideration for the new note given for additional shares of stock, unless there was a delivery of the stock. The contract for the purchase of the additional shares is a separate and distinct contract from any other connection which the defendant had with the creamery company by reason of having theretofore purchased three other shares for $150. If the $150 note was given in payment of the new shares, and if this could lawfully

be done, the defendant was entitled to receive such new shares. The contract must have the stamp of mutuality. If the note could be accepted for the payment of stock the stock must be delivered. If both are not bound, neither is bound and the transaction is a nullity. 1 Thomp. Corp. § 570.

Section 4529, Compiled Laws 1913, provides that no note or obligation given by a stockholder, whether secured by pledge or otherwise, shall be considered as payment of any part of the capital stock; but the capital stock shall be paid in, either in cash or in the manner provided in this article.

Section 4531, Compiled Laws 1913, provides that a corporation may purchase, hold, and transfer shares of its own stocks from its surplus profits, or as provided in the article on assessments of stock; or by the unanimous consent in writing of all its stockholders, in such manner and for such price or consideration as the said stockholders may unanimously decide upon.

In view of these provisions and the decision of this court in the case of Jackson v. Sabie, 36 N. D. 54, 161 N. W. 722, it would appear that the note in question would have no validity, though from the record it would appear that such issue is not presented to this court in this case. Hence we need not notice such matter further.

It is also very doubtful, under all the circumstances in this case, if there was any proper delivery of the note. If it were not to be delivered until compliance with all the conditions alleged to have been agreed upon by the parties, a delivery in violation of such agreement would be no valid delivery, and the note would not, under these circumstances, be a binding obligation, and would, in fact, be a nullity.

The verdict of the jury is well sustained by the evidence. The conclusion we have come to in this case is well sustained by the very recent decision of this court, and in the case of Raich v. Lindebek, 36 N. D. 133, 161 N. W. 1026, and Jackson v. Sabie, 36 N. D. 49, 161 N. W. 722.

The order denying motion for judgment notwithstanding the verdict, and the order denying a new trial, are in all things affirmed, with costs.

On Petition for Rehearing.

**PER CURIAM.** Plaintiff has petitioned for a rehearing. His petition is to some extent a reargument. But he also complains because a question raised with respect to the admissibility of certain evidence was not passed upon in the opinion. This question was considered by the court, but was not referred to in the opinion. It will be remembered that the note involved in this action was given for corporate stock. The defendant at the time of its execution also signed a certain stock-subscription agreement. A regular stock-selling campaign was carried on among the farmers in the vicinity of St. John, and the stock-subscription agreement was signed by many different persons. The plaintiff was the person primarily interested in the sales campaign. He interviewed the various subscribers. The defendant placed upon the stand other subscribers to show that the plaintiff made representations to such other subscribers similar to those which he made to the defendant. Plaintiff asserts that the admission of this testimony was error. While it is true, as plaintiff asserts, that "the law will not, as a general rule, permit an inference to be drawn that a person has done a certain act merely because he has done a similar act at some other time, it is also true that this rule is subject to certain well-recognized exceptions." And, "where the fraudulent intent of a party in the performance of an act is in issue, proof of other similar fraudulent acts is relevant and admissible to establish his intent or motive in the performance of the act in question, when it appears that there is such a connection between such other acts and the act in question as to authorize the inference that both are parts of one scheme or plan, in which the same motive is operative." 6 Enc. Ev. 33. The jury was informed by the trial court that the evidence in question was admitted for certain limited purposes. Under the facts existent in the case at bar, we believe the evidence in question was admissible. The other acts were all part of one plan or scheme. There was one common end sought by the plaintiff and his associates in the stock-selling scheme. We find no reason to recede from the conclusions reached in the former opinion.

Rehearing denied.